# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| THATH SIN, | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| v. | ) | **CIVIL ACTION** |
| | ) | **NO. 10-40226-TSH** |
| MASSACHUSETTS DEPARTMENT OF | ) | |
| CORRECTION, et al., | ) | |
| Defendants. | ) | |
| | ) | |

## REPORT AND RECOMMENDATION

### July 12, 2013

Hennessy, M.J.

By Order of Reference dated May 17, 2013, pursuant to 28 U.S.C. § 636(b)(1)(B) (Docket #52), this matter was referred to me for a Report and Recommendation on Defendants' Motion for Summary Judgment (Docket #43).  This Motion is now ripe for adjudication.

Plaintiff Thath Sin is a *pro se* prisoner in the Massachusetts Department of Correction ("DOC") and, at all times relevant to his complaint, has been housed at the North Central Correctional Institution ("NCCI") in Gardner, Massachusetts.  Sin filed his verified complaint on November 12, 2010, alleging that his dismissal from his institutional job as a flower-bed gardener violated his rights to equal protection and procedural due process under the Fourteenth Amendment and that it constituted cruel and unusual punishment under the Eighth Amendment. (Docket #1).  Defendants filed an answer to the complaint on April 14, 2011.  (Docket #20).  On October 28, 2011, Defendants filed a motion to dismiss, or in the alternative, for summary judgment.  (Docket #26).  The Court, construing the motion as a motion for judgment on the

pleadings, granted the motion in part and denied the motion in part.  (Docket #36).  The Court dismissed Sin's claims under the Due Process Clause and the Eighth Amendment but allowed Sin's Equal Protection claim to proceed, which is the only claim that remains before this Court. Defendants now move for summary judgment on the Equal Protection claim.

For the reasons that follow, I RECOMMEND that the Defendants' Motion for Summary Judgment be ALLOWED.

I.      BACKGROUND[1]

Sin is a prisoner in custody of the DOC at the NCCI.  (Docket #1 at ¶ 15; Docket #43-1 at ¶ 13).  He is an Asian male of Cambodian origin.  (Docket #43-2 at 14).[2]  At the times relevant to this action, Sin was held on the first floor of Thompson Hall at NCCI.  (Docket #43-1 at ¶ 13; Docket #43-2 at 17).

During the time period at issue, Sin participated in the institutional employment program at NCCI.  He was employed as a Clerk II and was responsible for working in the flower beds throughout the facility under the supervision of Defendant Michael Doiron, a recreation officer. (Docket #1 at ¶ 10; Docket #43-1 at ¶¶ 1, 18-19).  Sin's work duties also included distribution of seeds for the prison gardening program.  (Docket #1 at ¶ 10; Docket #43-2 at 37).  To allow him

---

[1] Although Plaintiff Thath Sin has not submitted any affidavits in support of his opposition to summary judgment, the undersigned will treat Sin's verified complaint "as the functional equivalent of an affidavit to the extent that it satisfies the standards explicated in [Federal Rule of Civil Procedure] 56[.]"  Sheinkopf v. Stone, 927 F.2d 1259, 1262 (1st Cir. 1991); see Fed R. Civ. P. 56(c)(4) ("An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.").

[2] Docket #43-2 is a transcript of Sin's deposition taken on December 14, 2012.  A sworn interpreter was present at the deposition.  (Docket #43-2 at 5).  In his response to the Motion for Summary Judgment, Sin states that the interpreter was not fluent in his native dialect and marginal at best.  (Docket #46 at 5).  In the response to the present motion, Sin alleges that the interpreter "twisted and contorted [his] words to mean something he was not saying," however, he does not give any specific examples of where he was misquoted.  (Id.).  At his deposition, Sin indicated that he understood the interpreter.  (Docket #43-2 at 7).  Sin also stated that he understood a great amount of English as he had lived in the United States for over twenty years but had problems with complicated words necessitating the translator.  (Docket #43-2 at 7).  Sin answered the vast majority of questions at the deposition without the aid of the translator.  Sin's list of suggested corrections to the deposition do not address any material matters.  (See id. at 67). Thus, I find no issue with the adequacy of the deposition as it relates to the issues relevant to this opinion.

to complete his duties, Sin was granted access to areas of the institution where other prisoners were not allowed and was given security clearance to work with shovels, rakes, and cultivators. (Docket #43-1 at ¶¶ 20, 22).  While working, Sin was required to wear a green vest that signified to correction officers that he was permitted access to areas that were normally off-limits to prisoners.  (Id. at ¶ 20).

The prison operates a recreational gardening program, under which selected inmates are allowed to plant and cultivate vegetables for personal consumption.[3]  (Docket #43-1 at ¶¶ 9, 15; Docket #43-2 at 27-28).  The gardening program is overseen by Doiron.  (Docket #43-1 at ¶ 9). Sin enrolled in the gardening program in 2009 and was enrolled in 2010, 2011, and 2012 and remains enrolled for the 2013 season.  (Docket #43-2 at 27).  All participants in the gardening program are required to attend orientation.  (Docket #43-1 at ¶ 15).  During orientation, all inmate participants are provided with the gardening program season rules and garden tool schedule with the new tool procedure.  (Id. at ¶ 11).  Every inmate participant acknowledges receipt of these rules and schedule by signing the "Garden Agreement Form."  (Id.).  Sin attended the orientation and signed the Garden Agreement Form.  (Docket #43-1 at 57-58; Docket #43-2 at 28).

At orientation, Doiron specifically reviews the "NCCI Institutional Procedures for Recreational and Leisure Time Activities/Medium," which states, "Items grown in the gardens are for the personal consumption of the inmate participant only and may not be given away, sold, or traded.  Storage or growing of seeds, plants, etc., in an inmate room is prohibited and will be considered contraband."  (Docket #43-1 at ¶ 15).  Sin admits that he was told of this rule. Docket #43-2 at 30).

---

[3] The stated purpose of the gardening program is "to provide Inmates with an opportunity to learn responsibility and gardening skills, while fostering positive self-esteem through teamwork with a group of inmates working toward the common purpose of planting and growing vegetables and/or flowers."  (Docket #43-1 at 39).

Sometime prior to April 2010, Doiron was informed that some inmates were stating that inmates Doiron supervised were storing and selling seeds.  (Docket #43-1 at ¶ 24).  Doiron approached a member of the Inner Perimeter Security ("IPS") and requested that he conduct a search of the cells of the three inmates Doiron supervised.  (Id.).  In response, on a date prior to the April 8, 2010 shakedown, IPS Harvey Vachon searched all three cells.[4]  (Id.).  Two of the inmates, Sin and Brian Larson, a white male, were found to be in violation of NCCI rules for storing seeds in their cells.[5]  (Docket #43-1 at ¶ 24; Docket #43-2 at 36, 42-43).  Doiron stated that he reminded each of these inmates that storing seeds in their cells was a violation of institutional rules.[6]  (Docket #43-1 at ¶ 24).

On April 8, 2010, a shakedown of the Thompson 1 building was conducted.  (Id. at ¶ 26).  All inmates housed in this unit were subject to the shakedown.  (Id.).  Defendant Curtis Deveneau, a lieutenant with the DOC assigned to NCCI, was in charge of the shakedown.  (Docket #1 at ¶ 6; Docket #43-1 at ¶ 26).  Vachon, who was assigned to search Sin's cell, found gardening seeds located inside of the metal support frame in Sin's cell.  (Docket #43-1 at ¶ 27).  Vachon informed Deveneau of the seeds who, in turn, informed Doiron.  (Id. at ¶¶ 27-28).

On April 9, 2010, Doiron informed Sin that he had been notified that seeds were found concealed in Sin's cell.  (Docket #1 at ¶ 12; Docket #43-1 at ¶ 30).  Doiron told Sin, "Vachon shook you down and found seeds in your cell.  Now I have to fire you."  (Docket #1 at ¶ 12).  Doiron advised Sin that he would not issue a disciplinary ticket as he did not want Sin's garden program privilege to terminate.  (Docket #43-1 at ¶ 30).

---

[4] A review of the record does not reveal the date of this search beyond the fact that it occurred prior to April 2010.

[5] Inmate Brian Larson is also referred to as "Larsons" and "Inmate X" in various filings with this Court.  (See, e.g. Docket #1 at ¶ 13; Docket #43-1 at ¶ 29).  It is clear that all appellations refer to the same person.

[6] Doiron stated that the concealing of seeds is a problem that warrants immediate attention, as, in his experience, inmates who store and conceal seeds are either trading seeds or selling seeds to other inmates for the coming season. (Docket #43-1 at ¶ 25).

On April 12, 2010, Sin requested alternate discipline from Doiron so he could retain his gardening job, which Doiron denied.  (Docket #1 at ¶ 14).  Sin then asked Doiron why his co-worker Larson, who had been found with seeds in his cell during the search preceding April 2010, had not been reprimanded.  (Id.).  Doiron explained that the seeds found in Larson's cell were found during a "regular shakedown" not a "major shakedown."[7]  (Id.).  Sin indicated his suspicion that the discrepancy in disciplinary actions resulted from racial prejudice on the part of Doiron.  (Id. at ¶ 15).  Doiron denied the accusation, stating that he was tired of seeds being found in cells.  (Id. at ¶ 16).

Later that day, Sin spoke with Vachon.  (Id. at ¶ 17).  Vachon stated that "it doesn't seem right" that Sin had been fired from his gardening position while Larson had not.  (Id. at ¶ 18).

On April 15, 2010, Sin submitted an informal complaint to Doiron regarding the events surrounding his dismissal, pursuant to DOC policy.  (Id. at ¶ 20).  On April 21, 2010, the complaint was denied by Deveneau.  (Id.).

That same day, Sin filed a formal grievance.  (Id. at ¶ 21).  The grievance was later denied by Defendant Sandra Richard, a correctional officer with the DOC assigned to NCCI.  (Id. at ¶¶ 7, 21).  On May 10, 2010, Sin appealed the denial to Defendant James Saba, the superintendent of NCCI.  (Id. at ¶¶ 5, 22).  The appeal was denied on June 2, 2010.  (Id. at ¶ 22).

Sin filed the instant complaint on November 12, 2010.  (Docket #1).  Sin was hired as a runner in Thompson 1 on April 1, 2011.  (Docket #43-1 at ¶ 32).

---

[7] Because he was housed in Thompson 2, Larson was not subject to the shakedown on August 8, 2010, which was limited to Thompson 1.  (Docket #43-1 at ¶ 29).  Sin makes no allegation that the decision to shakedown Thompson 1 was racially motivated.  On October 24, 2012, Larson was issued a disciplinary ticket when it was discovered that he had attempted to send unauthorized items, specifically thirty-five packages of seeds from the gardening program, via the property department visitor pick-up system.  (Docket #43-1 at ¶ 33).  After pleading guilty to the ticket, Larson was terminated from the institutional work program and was disqualified from participating in the gardening program for the 2013 season.  (Id. at ¶ 34).

## II.    STANDARD OF REVIEW

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).   Once a party has properly supported its motion for summary judgment, the burden shifts to the non-moving party, who "may not rest on mere allegations or denials of his pleading, but must set forth specific facts showing there is a genuine issue for trial." Barbour v. Dynamics Research Corp., 63 F.3d 32, 37 (1st Cir. 1995) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986)).   Moreover, the Court is "obliged to []view the record in the light most favorable to the nonmoving party, and to draw all reasonable inferences in the nonmoving party's favor." LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 841 (1st Cir. 1993).   Even so, the Court is to ignore "conclusory allegations, improbable inferences, and unsupported speculation." Sullivan v. City of Springfield, 561 F.3d 7, 14 (1st Cir. 2009) (quotation omitted).   These standards for summary judgment apply even where, as here, the plaintiff proceeds *pro se*.   See Posadas de Puerto Rico, Inc. v. Radin, 856 F.2d 399, 401 (1st Cir. 1988).

## III.    ANALYSIS

The Equal Protection Clause of the Fourteenth Amendment provides that similarly situated persons are entitled to receive similar treatment at the hands of government actors. See City of Cleburne v. Cleburne Living Ctr., 472 U.S. 432, 439 (1985).   It "is essentially a direction that all persons similarly situated should be treated alike." Id.   To state an equal protection claim, a plaintiff must allege that he "was treated differently from 'others similarly situated . . . based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person.'" Clark v.

Boscher, 514 F.3d 107, 114 (1st Cir. 2008) (quoting Aponte-Torres v. Univ. of P.R., 445 F.3d 50, 57 (1st Cir. 2006)) (alterations in original).

Two persons or entities are similarly situated if "a prudent person, looking objectively at the incidents [complained of], would think them roughly equivalent and the protagonists similarly situated . . . in all relevant respects." Clark v. Boscher, 514 F.3d 107, 114 (1st Cir. 2008) (quoting Barrington Cove, Ltd. P'ship v. R.I. Hous. & Mortg. Fin. Corp., 246 F.3d 1, 8 (1st. Cir. 2001)) (alterations in the original). "Exact correlation is neither likely nor necessary, but the cases must be fair congeners. In other words, apples should be compared to apples." SBT Holdings, LLC v. Town of Westminster, 547 F.3d 28, 34 (1st Cir. 2008) (quoting Barrington Cove, 246 F.3d at 8).

Sin alleges that Doiron fired him from his institutional gardening job for stealing seeds and that Larson, a white prisoner with the same job, was not fired or otherwise punished for substantially the same conduct. However, Sin's conduct is easily distinguished from that of Larson. NCCI officials found seeds in Sin's cell on two separate occasions, during the search preceding April 2010 and during the shakedown on April 8, 2010. Larson was found with seeds on a single occasion prior to the April 8 shakedown.[8] Hence, Sin is not comparing "apples to apples" when he compares his conduct to that of Larson and, therefore, he has failed to allege that he was treated differently from "others similarly situated" because of his race. Thus, Sin's equal protection claim is precluded and I recommend that Defendants be granted summary

---

[8] Sin was found with seeds during this same search. Upon being notified of the results of this search, Doiron reminded both Sin and Larson that storing seeds in their cells was a violation of institutional rules but did not punish either of them in any other manner. (Docket #43-1 at ¶ 24).

judgment.[9]   Because I find that Defendants are entitled to summary judgment on this ground, I do not address the merits of the Defendants' other arguments in favor of summary judgment.

IV.   CONCLUSION

For the foregoing reasons, I hereby RECOMMEND that the Defendants' Motion for Summary Judgment be ALLOWED.[10]


/S/ David H. Hennessy
David H. Hennessy
UNITED STATES MAGISTRATE JUDGE

---

[9] I note that this finding is consistent with Judge Saylor's opinion on Defendant's Motion for Judgment on the Pleadings.  As part of that motion, Defendants submitted Doiron's deposition in which he averred that seeds were found in Sin's cell on two separate occasions while they were only found once in Larson's cell.  Judge Saylor noted that, while he could not rely on such a document when considering a motion for judgment on the pleadings, such facts would distinguish Sin from Larson and preclude his equal protection claim.  (Docket #36 at 8 n.3).  Sin has submitted no evidence countering these facts.

[10] The parties are hereby advised that, under the provisions of Fed. R. Civ. P. 72, any party who objects to these proposed findings and recommendations must file specific written objections thereto with the Clerk of this Court within 14 days of the party's receipt of this Report and Recommendation.  The written objections must specifically identify the portion of the proposed findings, recommendations, or report to which objections is made and the basis for such objections.  The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with Rule 72(b) will preclude further appellate review of the District Court's order based on this Report and Recommendation.  See Keating v. Sec'y of Health & Human Servs., 848 F.2d 271, 275 (1st Cir. 1988); United States v. Emiliano Valencia-Copete, 792 F.2d 4, 6 (1st Cir. 1986); United States v. Vega, 678 F.2d 376, 378-79 (1st Cir. 1982); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 604-05 (1st Cir. 1980); see also Thomas v. Arn, 474 U.S. 140 (1985).